## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| MELISSA DARGA, individually and on behalf of<br>a collective of others similarly-situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. _____ |
| | ) | Judge: _____ |
| AUBREY'S RESTAURANT GROUP, | ) | |
| d/b/a AUBREY'S, INC., | ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) | |

_____

## COMPLAINT
_____

COMES NOW, the Plaintiff, MELISSA DARGA, in her individual capacity and on behalf of a proposed collective and classes of similarly-situated female employees, bring this action to address gender discrimination in employee pay practices perpetuated by Defendant, AUBREY'S RESTAURANT GROUP d/b/a AUBREY'S INC., and for cause of action would show unto this Honorable Court as follows:

<u>**NATURE OF THE CASE**</u>

1.     Defendant, Aubrey's Restaurant Group, d/b/a Aubrey's, Inc., is a for-profit corporation with its principal address at 5401 Kingston Pike Suite 280, Building 1, Knoxville, Tennessee, 37919-5073, and may be served with process by its Registered Agent, Aubrey Randolph Burleson, located at 5401 Kingston Pike Suite 280, Building 1, Knoxville, Tennessee, 37919-5073.

2.     Plaintiff, Melissa Darga, (hereinafter "Plaintiff") is a citizen and resident of Knox County, Tennessee.

3.     Plaintiff was originally hired by Defendant as a Server in 2009. Over the next several years, Plaintiff diligently overcame obstacles to be promoted to Bartender in 2011, Assistant Manager in 2013, and finally General Manager in January of 2018.  Plaintiff remained in the position of General Manager up until her termination as hereinafter alleged.

4.     During her employment with Defendant, Plaintiff earned several promotions, positive evaluations, and she never received a written disciplinary action or written reprimand.

5.     Plaintiff brings Count I, on behalf of herself individually and a collective action class of similarly-situated female employees, for violations of the Equal Pay Act of 1963 ("Equal Pay Act"). Plaintiff seeks to recover damages for the collective action class, including, but not limited to, back pay, liquidated damages, reasonable attorneys' fees, and litigation costs.

6.     Plaintiff brings Count II, on behalf of herself individually and a class of similarly-situated female employees, for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., ("Title VII"). Plaintiff seeks to recover damages for a class of similarly situated female employees at Defendant, including, but not limited to back pay, front pay, liquidated damages, punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigations costs, and other compensation.

7.     Plaintiff brings Count III, on behalf of herself and a class of similarly situated female employees, for violations of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.* ("THRA"). Plaintiff seeks to recover damages for a class of similarly situated female employees at Defendant, including, but not limited to back pay, front pay, liquidated damages, punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigations costs, and other compensation.

8.     Plaintiff brings Counts IV, on behalf of herself individually, for the discrimination

and retaliation that resulted in Plaintiff's wrongful termination in violation of the Equal Pay Act, Title VII, THRA, and Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq.* Plaintiff seeks to recover damages, on behalf of herself individually, including, but not limited to, compensatory damages, liquidated damages, punitive damages, reasonable attorneys' fees, and litigation costs.

## JURISDICTION AND VENUE

9.     Jurisdiction is founded upon Federal Question, 28 U.S.C. § 1331, Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq.*, and the doctrine of Supplemental Jurisdiction, 28 U.S.C. § 1367 for the state law claims.

10.     Venue is proper under the code provisions cited herein, and 28 U.S.C. § 1391(b) and (c).

11.     At all times stated herein, Defendant is an employer subject to the provisions of the Equal Pay Act of 1963, 29 U.S.C. § 206(d), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.*

12.     At all times stated herein, Defendant is an employer subject to the provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*, the Tennessee Equal Pay Act, Tenn. Code Ann. § 50-2-201, *et seq.*, and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq.*

13.     Defendant is an employer engaging in an industry affecting commerce and employs more than five-hundred and one (501) employees in the State of Tennessee.

## ADMINISTRATIVE PROCEEDINGS

14.     On or about July 3, 2019, Plaintiff filed a timely Charge of Discrimination and

Retaliation with the Equal Employment Opportunity Commission ("EEOC"). (EEOC Charge, attached hereto as Exhibit 1, and is incorporated herein by reference).

15.     The Plaintiff's EEOC Charge (Exh. 1) was timely filed.

16.     The Plaintiff received a Notice of Right to Sue from the EEOC, dated January 7, 2020. (Notice of Right to Sue from EEOC, attached hereto as Exhibit 2, and same is incorporated herein by reference).

17.     The Plaintiff has filed this suit within ninety (90) days of the date of the Notice of Right to Sue. (Exh. 2).

18.     This suit is timely filed.

19.     The Plaintiff has exhausted the administrative remedies available to her, and all others similarly situated, and all necessary and appropriate administrative prerequisites to the filing of this Complaint have occurred and been satisfied.

<u>**FACTUAL ALLEGATIONS**</u>

20.     At all times material hereto, Randy Burleson was the owner and Chief Executive Officer ("CEO") of Defendant and its group of closely held interrelated restaurant establishments and concepts, including but not limited to, Aubrey's, Sunspot, Barley's Maryville, Drink, Bistro By The Tracks, Fieldhouse Social, and Stefano's Pizza, that share and/or co-mingle its various employees and managers, as well as equipment and inventory.

21.     At all times material hereto, Randy Burleson was an agent and employee of Defendant, and he had the authority to discipline and terminate all employees employed by Defendant.

22.     Defendant's restaurants all operate out of the same main office, sharing the same principal office address and mailing address, as well as the same registered agent, Randy Burleson,

at 5401 Kingston Pike Ste. 280 Bldg. 1, Knoxville, Tennessee, 37919-5073.

23.     Owner and CEO, Burleson, keeps all books and records at one central location, the pay stubs contain the names of each of Defendant's restaurants, and therefore, on information and belief, all of Defendant's employees' pay come out of the same checking business account.

24.     Within Defendant's restaurants, the owner and CEO, Burleson, maintains strict, centralized control over the employees, which includes hiring, firing, and wage decisions. In order to maintain this control, Burleson has a rigid top down, hierarchical corporate structure.

25.     Each of Defendant's restaurants are even advertised together as closely held interrelated restaurants at www.burlesonbrands.com.

26.     At the times material hereto, Mark Liggett was employed as the Chief Operating Officer ("COO") of Defendant's various other restaurant establishments operated by the owner and CEO, Randy Burleson.  Liggett assists in overseeing the restaurants' operations at the behest and direction of Burleson.

27.     At all times stated herein, Mark Liggett was an agent and employee of Defendant, and had the authority to discipline and terminate all employees employed by Defendant at the approval of the owner and CEO, Randy Burleson.

28.     Director of Human Resources, Craig Krauss, is over all of the Defendant's restaurants and the employees therein, and Krauss serves in this position at the behest and direction of Burleson.

29.     In relevant part, the Defendant employs two different types of managers over each of its restaurant locations:  General Managers and Assistant Managers.  Assistant Managers report directly to the General Managers, and in turn, the General Managers report to CEO, Randy Burleson. Burleson has final approval over all promotions and compensation of both General

Managers and Assistant Managers.

30.     Generally, at each of Defendant's restaurants, there is one General Manager and three to four Assistant Managers.

31.     The work performed by each of the General Managers requires substantially equal (A) skill, (B) effort, (C) responsibility, and (D) under similar working conditions.

32.     Each of the General Managers perform substantially equal work.

33.     The work performed by each of the Assistant Managers requires substantially equal (A) skill, (B) effort, (C) responsibility, and (D) under similar working conditions.

34.     Each of the Assistant Managers perform substantially equal work.

35.     At all times material hereto, the General Managers have greater responsibility than the Assistant Managers.

36.     Generally, the work and job duties performed by General Managers requires substantially more skill, effort, and responsibility than the work and job duties performed by the Assistant Managers.

37.     For example, the work and job duties performed by General Managers requires more difficult and demanding working conditions than the work performed by the Assistant Managers, such as overseeing and supervising the entire restaurant operations, including other managers thereof, scheduling, and so forth.

38.     Therefore, the Assistant Managers do not perform the same amount of work or job duties as the General Managers since Assistant Managers have less responsibility and job duties as compared to the General Managers.

39.     Since at least 2013, Defendant's Assistant Managers and General Managers have been overwhelmingly male.  In order for these management employees to be hired, have their

wages set, or have their wages increased, the owner and CEO, Randy Burleson, ultimately decides and/or approves these decisions, and Burleson has, and continues to have, the sole authority to set and authorize every restaurant-level management employee's pay. As a result, Defendant's top executive leadership has executed a top down wage policy, which consistently, systematically, and willfully discriminates on the basis of sex/gender by paying its female employees less than their male colleagues, in the same positions, for the same work.

40.     At all times material hereto, the final compensation of Assistant Managers must be approved by the owner and CEO, Randy Burleson.

41.     At all times material hereto, the final compensation for General Managers must be approved by the owner and CEO, Randy Burleson.

42.     At all times stated herein, Defendant did not maintain any written policy, procedure, or guideline evidencing and/or detailing the pay scale, or pay raises, or the compensation structure, or the pay schedule for each managerial position.

43.     At all times stated herein, the compensation and pay raises of managerial employees, including Assistant Managers and General Managers, were determined and approved at the discretion of the owner and CEO, Randy Burleson.

44.     It is Defendant's position that it determines how much to pay managerial employees based, in part, on their experience and performance, and other factors for determining pay include each respective "employee's experience in a particular restaurant" and on the "commitment of the manager to travel on a regular basis in order to work at multiple restaurants as needed".

45.     Defendant's arbitrary and capricious reasons for its decisions on wages and/or pay increases creates and encourages a deliberate discrimination against women that manifests itself

in the salaries and rates of pay for each management position within Defendant's closely held and controlled restaurants.

46.     Defendant deliberately and willfully pays female Assistant Managers and General Managers less than their male colleagues in the same positions with the same responsibilities. The wage disparity between female and male employees, at all levels of management within Defendant's restaurants, is based solely on gender.

47.     The General Managers and Assistant Managers are interchangeably moved between Defendant's different restaurants, on an as needed basis, as determined by the owner and CEO, Randy Burleson, such that he will frequently assign the manager's location of employment and thereafter change that location to another restaurant as needed.

48.     The management-level employees, such as the General Managers and Assistant Managers, are able to interchange work locations because their daily job duties at each of the restaurants are the same and are performed under similar working conditions, and the restaurants are operationally indistinguishable.

49.     At all times stated herein, the compensation of Defendant's managerial employees was not based on the respective performance, profitability, or volume of the restaurant where they worked.

50.     At all times stated herein, the Defendant's managerial employees did not receive bonuses or additional compensation based on the respective performance, profitability, or volume of the restaurants where they worked.

### PLAINTIFF'S EXPERIENCE WORKING FOR DEFENDANT

51.     After she was hired as a Server in 2009, Plaintiff was among the most talented and dedicated of Defendant's restaurant-level employees. Despite Plaintiff's demonstrated acumen and

dedication, as she rose through the ranks to Assistant Manager in 2013 and eventually General Manager in 2018, she was consistently paid less than her male colleagues who had the same title and performed the same work. The only basis for the wage disparity between Plaintiff and her male colleagues was Defendant's consistent and deliberate discriminatory pattern of gender-based wage discrimination against women.

52. During Plaintiff's employment when she was an Assistant Manager, she was paid less than similarly-situated male Assistant Managers.

53. During Plaintiff's employment when she was a General Manager, she was paid less than similarly-situated male General Managers.

54. After Plaintiff was promoted to Assistant Manager, she indirectly reported to the owner and CEO, Randy Burleson. When she became General Manager, Plaintiff began reporting directly to Burleson.

55. Throughout her employment, Plaintiff's pay did not increase based on the business volume and/or sales of the restaurants where she worked.

56. Throughout her employment, Plaintiff's pay did not increase based on the number of employees she supervised.

57. Throughout her employment, Plaintiff's pay did not increase based on her experience in a particular restaurant.

58. Throughout her employment, Plaintiff's pay did not increase based on her commitment to travel on a regular basis in order to work at multiple restaurants as needed.

59. Rather, throughout her employment, Plaintiff's pay increased based on her longevity with Defendant, and also based on her promotions within the company from hourly employee to Assistant Manager, and then from Assistant Manager to General Manager, and the

amount of the pay raises were at the discretion of the owner and CEO, Randy Burleson.

60.     Throughout Plaintiff's tenure as an Assistant Manager and General Manager, she was frequently and interchangeably moved to Defendant's different restaurants, as needed and as determined by the owner and CEO, Randy Burleson.

61.     For example, during the time Plaintiff was employed as Assistant Manager from 2013 to 2018, she worked at multiple different restaurants, including: (A) Aubrey's in Cedar Bluff, (B) Aubrey's in Maryville, (C) Aubrey's in Oak Ridge, (D) Aubrey's in Strawberry Plains, (E) Aubrey's in Farragut, (F) Aubrey's in Lenoir City, (G) Aubrey's in Powell, (H) Sunspot, and (I) Fieldhouse Social.

62.     During the time Plaintiff was employed as Assistant Manager, the restaurants where she worked performed successfully, business and volume increased, and Plaintiff performed her job duties in a successful and competent manner.

63.     During the time Plaintiff was employed as Assistant Manager, her pay did <u>not</u> consistently increase based on: (A) moving from restaurant-to-restaurant, (B) the successful performance of the restaurants where she worked, (C) the sales volume of the restaurants where she worked, (D) the number of employees she supervised as manager, (E) her experience working in a particular restaurant, or (F) her commitment to work and travel on a regular basis to work multiple restaurants as needed.

64.     For example, the Plaintiff did not receive a pay increase upon being moved to work at Fieldhouse Social in 2015.

65.     Assistant Manager, Justin Wright, did receive a pay increase upon being moved to work at Fieldhouse Social.

66.     Justin Wright is male.

67.    In late-2016 and/or early-2017, male employee, Ben Breedlove, and Plaintiff were both employed as Assistant Managers at Sunspot.

68.    Ben Breedlove was originally hired by Defendant around the same time as Plaintiff in 2009.

69.    Ben Breedlove and Plaintiff were promoted to the position of Assistant Manager within months of each other in 2013.

70.    After Plaintiff was promoted to Assistant Manager in 2013, her pay started at around $46,000 per year.

71.    Thereafter, Plaintiff's pay increased sparingly during the time she was Assistant Manager from 2013 to early-2018, and eventually stopped at $52,000 per year.

72.    During the time Plaintiff was employed as Assistant Manager, the highest that she ever earned was $52,000 per year.

73.    As of late-2016 and early-2017, the Plaintiff had the same tenure with Defendant as Ben Breedlove.

74.    As of late-2016 and early-2017, the Plaintiff had the same or more experience, including total restaurant experience, than Ben Breedlove.

75.    As of late-2016 and early-2017, as Assistant Managers, Ben Breedlove and Plaintiff were both paid $52,000 per year.

76.    In late-2016 and/or early-2017, Ben Breedlove received a $5,000 raise.

77.    The owner and CEO, Randy Burleson, made the decision and/or was involved in the decision-making process to give Ben Breedlove the above-referenced $5,000 raise.

78.    At the time Ben Breedlove received the above-referenced $5,000 raise in late-2016 or early-2017, he had worked at Sunspot for the majority of his employment as a Bartender, and

then was moved to Barley's in Maryville to train as an Assistant Manager, but he did not like

working at Barley's so he thereafter moved back to Sunspot at his request.

79.     At the time Ben Breedlove received the above-referenced raise in late-2016 or

early-2017, the Plaintiff had worked at various locations for Defendant as an Assistant Manager,

as needed, and she had been working at Sunspot for about one year.

80.     Shortly thereafter, in or around January of 2017, Plaintiff approached the owner

and CEO, Randy Burleson, to request the same $5,000 raise that Ben Breedlove received but, in

response, Burleson laughed in her face, told Plaintiff "no", and then asked "why do you even want

one?"  Plaintiff then complained that she knew that Burleson had just given a $5,000 raise to male

manager, Ben Breedlove, and that Breedlove was now earning much more than Plaintiff even

though they performed the same amount of work, carried out the same job duties, and had the same

amount of experience and tenure with Defendant.  In response to this complaint, Burleson was

dismissive, became visibly annoyed with Plaintiff and walked away only stating that he "couldn't

afford" Plaintiff, but this was not accurate or truthful.

81.     In or around January of 2017, the Plaintiff requested a pay raise for the first time

during her employment with Defendant.

82.     At the time Plaintiff was rejected for the raise, as described above, the Plaintiff was

the only female manager employed at Sunspot.

83.     At the time Plaintiff was rejected for the raise as described above, the Plaintiff was

being paid less than all of the other managers employed at Sunspot.

84.     In January of 2018, the Plaintiff was promoted to the title of General Manager, and

around that time, she was moved to a new restaurant concept, known as Stefano's Turkey Creek.

85.     Prior to Plaintiff being promoted to General Manager in January of 2018, she was

told by the owner and CEO, Randy Burleson, that her pay would increase to reflect the General Manager title.

86.     However, the Plaintiff did not actually receive any pay increase in January 2018, and was told by the owner and CEO, Randy Burleson, that she would not receive any pay increase until Stefano's Turkey Creek actually opened.

87.     As a result, the Plaintiff did not receive any pay increase until on or about March 26, 2018, nearly three and a half months after her promotion to the General Manager position.

88.     After she was transferred to Stefano's Turkey Creek, the Plaintiff began preparing the restaurant and staff for its opening in her capacity as General Manager.

89.     On or about March 26, 2018, the Stefano's Turkey Creek location opened for business.

90.     As of March 26, 2018, the Plaintiff had been working in the capacity of General Manager of Stefano's Turkey Creek since January 2018.

91.     After the opening of Stefano's Turkey Creek on or about March 26, 2018, Plaintiff's pay increased from $52,000 per year to $59,000 per year.

92.     At that time in March 2018, the Plaintiff was told for the first time by owner and CEO, Randy Burleson, that her raise of $59,000 per year was only a "partial raise", and that Plaintiff would receive the rest of her raise for her promotion to General Manager once the other Stefano's location in Hardin Valley was opened.

93.     The Plaintiff did not receive any additional compensation for her efforts and work to open the other Stefano's location in Hardin Valley.

94.     Thereafter, the Stefano's Hardin Valley location opened in late-November or early-December 2018.

95.     After the Stefano's Hardin Valley location opened, however, the Plaintiff did not receive any of the remaining "partial raise" that she was promised.

96.     Defendant did not give Plaintiff the remaining "partial raise" for her promotion to General Manager in retaliation for Plaintiff's refusal to overturn the demotion of male employee, Josh Morrison, as alleged herein.

97.     During Plaintiff's employment as General Manager, the most that she was paid was $59,000 per year.

98.     In late-December 2018, the Defendant began a new practice of placing the employees' paychecks into individual envelopes that were then distributed by Plaintiff to the employees in her restaurant.

99.     Prior to December 2018, however, the employees' paychecks arrived in only one large envelope and it was the responsibility of the Plaintiff and her Kitchen Manager to distribute the paychecks to the employees in the restaurant.

100.    As a result, after the paychecks began to be placed into the individual envelopes in December 2018, the Plaintiff questioned this new practice to the Director of Human Resources, Craig Krauss, to which Krauss replied, "Randy [Burleson] said it is none of your business".

101.    This new practice of placing the employees' paychecks into individual envelopes was done to further conceal the disparate pay of the male employees over the females.

102.    The Plaintiff's restaurant was Defendant's only restaurant that maintained this practice of putting the employees' paychecks into individual envelopes.

103.    General Manager, Mickey Korzybski, a male, opened another restaurant concept on behalf of Defendant, known as Fieldhouse Social.

104.    In 2015, Mickey Korzybski was transferred to Fieldhouse Social in the capacity of

General Manager, and he worked for at least three (3) months to prepare the restaurant and staff for the restaurant's initial opening.

105.    In 2015, Mickey Korzybski received an immediate pay raise after he was transferred to Fieldhouse Social as General Manager, prior to the initial opening of the restaurant, and Korzybski was also not required to close the restaurant as part of his arrangement with owner and CEO, Randy Burleson.

106.    The owner and CEO, Randy Burleson, made the decision and/or was involved in the decision-making process to immediately increase Mickey Korzybski's pay upon his transfer to Fieldhouse Social prior to its opening.

107.    Throughout Plaintiff's employment as General Manager, she was required to close the restaurant where she worked.

108.    Defendant further pays its male Assistant Managers more than what its female General Managers, including Plaintiff, are paid in their position as General Manager.

109.    Justin Miller, another male employee, was originally hired by Defendant as a Server in 2012.

110.    In 2013, Plaintiff was the Assistant Manager at the restaurant where Justin Miller was originally hired by as a Server, and he began reporting to Plaintiff at that time.

111.    Justin Miller was thereafter promoted, and he eventually became an Assistant Manager in or around 2016 or 2017.

112.    As of February 2019, the Plaintiff was employed as a General Manager, and Justin Miller was employed as an Assistant Manager.

113.    As of February 2019, the Plaintiff had a longer tenure with Defendant than Justin Miller.

114.    As of February 2019, the Plaintiff had more experience, including management experience, than Justin Miller.

115.    As of February 2019, the Plaintiff had more positive evaluations than Justin Miller.

116.    As of February 2019, the Plaintiff's entire work performance was equal to, if not better, than Justin Miller's performance.

117.    As of February 2019, Justin Miller was employed as an Assistant Manager at Aubrey's Papermill Road location, and he would also occasionally work at the Cedar Bluff Aubrey's location.

118.    As of February 2019, Justin Miller was being paid $65,000 per year as an Assistant Manager.

119.    As of February 2019, Plaintiff was being paid $59,000 per year as a General Manager.

120.    Previously, Plaintiff regularly worked as Assistant Manager at multiple restaurant locations as needed, for example, Plaintiff worked as an Assistant Manager at both Fieldhouse Social and Sunspot in 2017, and Plaintiff also worked at the Aubrey's Papermill Road location in late-2017 and early-2018, and furthermore, during the time Plaintiff worked at Aubrey's in Maryville, she also filled in as needed at Aubrey's in Cedar Bluff, Aubrey's in Farragut, Aubrey's in Oak Ridge, Aubrey's in Strawberry Plains, and Aubrey's in Lenoir City.

121.    The sales volume, staff sizes, and Assistant Manager responsibilities of the Aubrey's Papermill Road location as of February 2019 is substantially similar as it was during the time Plaintiff worked at this location in late-2017 and early-2018.

122.    During their employment, Justin Miller was paid more as an Assistant Manager than what Plaintiff was paid during the time she was an Assistant Manager, as well as a General

Manager.

123.     In addition to Justin Miller, multiple other male Assistant Managers and/or General Managers are paid more than what the female Assistant Managers and/or General Managers are paid during their employment, including the Plaintiff, and this is due to sex discrimination.

<u>COLLECTIVE ACTION ALLEGATIONS UNDER THE EQUAL PAY ACT</u>

124.     Defendant has engaged in systemic gender discrimination against its female employees. Defendant has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices, and procedures, including but not limited to common compensation and performance management policies, and centralized decision-making.

125.     Plaintiff re-alleges and incorporates by reference each and every allegation in the previous paragraphs alleging common policies, practices, and procedures resulting in unequal pay earned by female employees in Defendant's corporate-owned restaurants.

126.     Plaintiff brings this claim for violations of the Equal Pay Act as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of all members of the Collective Action Class. The Collective Action Class is defined as follows:

> All female General Managers and Assistant Managers at any of Defendant's restaurants from February 25, 2017 to the present.

127.     Plaintiffs seek to represent all female General Managers and Assistant General Managers, as described above, who were paid less than male employees doing similar work. The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

128.     Questions of law and fact common to the Collective Action Class and Plaintiff, include but are not limited to, the following:

> A.     Whether Defendant unlawfully failed and continues to unlawfully fail to compensate female General Managers and Assistant Managers at a level commensurate with comparable male employees;

B. Whether Defendant's policy, practice, or procedure of failing to compensate female General Managers and Assistant Managers at a level commensurate with comparable male employees violates the applicable provisions of the Equal Pay Act; and

C. Whether Defendant's failure to compensate female General Managers and Assistant Managers at a level commensurate with comparable male employees was willful within the meaning of the Equal Pay Act.

129. Plaintiff's Equal Pay Act claim may be maintained as an "opt-in" collective action pursuant to 29 U.S.C. 216(b) because Plaintiff is similarly situated to the female employees described in the Collective Action Class. Plaintiff's claims are similar to the claims asserted by the Collective Action Class.

130. Plaintiff and the Collective Action Class are (a) similarly situated; and (b) are subject to Defendant's common compensation policies, practices and procedures and centralized decision-making resulting in unequal pay based on sex by failing to compensate female General Managers and Assistant Managers employees at a level commensurate with male employees who perform substantially equal work and/or hold equivalent levels, job titles, and positions.

## CLASS ACTION ALLEGATIONS UNDER RULE 23 OF FED. R. CIV. P.

131. Defendant has engaged in systemic gender discrimination against its female employees. Defendant has caused, contributed to, and perpetuated gender-based pay disparities through common policies, practices, and procedures, including but not limited to common compensation and performance management policies, and centralized decision-making.

132. Plaintiff re-alleges and incorporates by reference each and every allegation in the previous paragraphs alleging common policies, practices, and procedures resulting in unequal pay earned by female employees in Defendant's restaurants.

133. Plaintiff brings the Title VII statutory claims pursuant to Fed. R. Civ. P. 23 on

behalf of a class (the "Title VII Class") defined as:

> All female employees who are or have been employed by Defendant as restaurant-level management employees, including Assistant Managers and General Managers, during the applicable limitations period up until this Class is finally certified by the Court.

134. Plaintiff brings the THRA statutory claims pursuant to Fed. R. Civ. P. 23 on behalf of a class (the "THRA Class," and collectively with the Title VII Class as "Classes") defined as:

> All female employees who are or have been employed by Defendant in the State of Tennessee, as restaurant-level management employees, including Assistant Managers and General Managers, during the applicable limitations period up until this Class is finally certified by the Court.

135. Plaintiff seeks to represent all female restaurant-level management employees, as described above, who were paid less than male employees for doing similar work. The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

136. The Classes as defined above are identifiable. Plaintiff is a member of each of the Classes.

137. The Classes, upon information and belief, consists of both current and former employees of Defendant's numerous restaurants, and is thus so numerous that joinder of all members is impracticable.

138. Furthermore, members of the Classes still employed by Defendant may be reluctant to raise individual claims for fear of retaliation.

139. The issues in this lawsuit present common questions of law and fact which are not only common to the Classes, but which predominate over any questions affecting only individual members of the Classes. The predominating common questions include, but are not limited to:

> A.   Whether Defendant unlawfully failed and continues to unlawfully fail to compensate female management employees at a level commensurate with comparable male employees;

B. Whether Defendant's policy, practice, or procedure of failing to compensate female management employees at a level commensurate with comparable male employees violates the applicable provisions of Title VII and/or the THRA; and

C. Whether Defendant's failure to compensate female management employees at a level commensurate with comparable male employees was willful within the meaning of Title VII and/or the THRA.

140. The prosecution of the separate actions by individual members of the Classes would create a risk of establishing incompatible standards of conduct for Defendant, within the meaning of Fed. R. Civ. P. 23(b)(1)(A).

141. The claims of Plaintiff are typical of the claims of each member of the Classes, within the meaning of Fed. R. Civ. P. 23(a)(3), and are based on and arise out of identical facts constituting the wrongful conduct of Defendant.

142. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and the Classes have retained counsel experienced and competent in litigating complex employment litigation.

143. Plaintiff has no conflict of interest with the Classes.

144. Plaintiff is able to fairly and adequately represent and protect the interest of the members of the Classes.

145. The common questions of law and fact enumerated above predominate over questions affecting only individual members of the Classes, and a class action is the superior method for fair and efficient adjudication of the controversy, within the meaning of Fed. R. Civ. P. 23(b)(3). The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

146. There are no unusual difficulties in the management of this case as a class action.

147. The books and records of Defendant are material to this litigation as they disclose

the positions, salary/wages paid, bonuses paid, promotions and other information relevant to all of

its employees, including information specific to the unlawful gender discrimination experienced

by members of the Classes.

148.     Plaintiff's Title VII and THRA claims should be certified as class actions pursuant

to Federal Rule of Civil Procedure 23.

**COUNT I**
**(INVIDUAL AND COLLECTIVE ACTION CLASS CLAIM)**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,**
**AS AMENDED BY THE EQUAL PAY ACT OF 1963 ("EQUAL PAY ACT"),**
**29 U.S.C. § 206, *ET SEQ*.**
**DENIAL OF EQUAL PAY FOR EQUAL WORK**
**(Asserted by Plaintiff and the Collective Action Class Against Defendant)**

149.     Plaintiffs re-allege and incorporate by reference each and every allegation in the

previous paragraphs as though fully set forth herein.

150.     This Count is brought on behalf of Plaintiff and all members of the Collective

Action Class against Defendant.

151.     Defendant is an employer of Plaintiff and the members of the Collective Action

Class within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206, *et seq*., as

amended by the Equal Pay Act of 1963.

152.     Defendant has discriminated against Plaintiff and the members of the Collective

Action Class by paying them less than similarly situated male employees who performed jobs

which required equal skill, effort, and responsibility, and which were performed under similar

working conditions.

153.     Defendant discriminated against Plaintiff and the members of the Collective Action

Class by subjecting them to common discriminatory pay and performance management policies,

including discriminatory salaries and hourly wages in violation of the Equal Pay Act.

154.     The differential in pay between Plaintiff and the members of the Collective Action Class and similarly situated male employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex, but was, in fact, due exclusively to sex.

155.     Defendant caused, attempted to cause, contributed to, and caused the continuation of wage rate discrimination based on sex in violation of the Equal Pay Act.

156.     Defendant intentionally paid Plaintiff and the members of the Collective Action Class less than similarly-situated male employees in violation of the Equal Pay Act. The foregoing conduct constitutes a willful violation of the Equal Pay Act within the meaning of 29 U.S.C. § 255(a). Because Defendant has willfully violated the Equal Pay Act, a three-year statute of limitations applies to such violations pursuant 29 U.S.C. § 255(a).

157.     As a result of Defendant's unlawful conduct, Plaintiff as well as the members of the Collective Action Class suffered and will continue to suffer harm, including, but not limited to, lost earning, lost benefits, lost future employment opportunities, and other financial losses, as well non-economic damages.

158.     Plaintiff and the Collective Action Class are entitled to all legal and equitable remedies available for violations of the Equal Pay Act, including, but not limited to, back pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigations costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## <u>PRAYER FOR RELIEF ON COUNT I</u>

WHEREFORE, Plaintiff, on behalf of herself and the Collective Action Class, pray that this Honorable Court:

A.     Designate this action as a collective action on behalf of the proposed Collective Action Class, and

a. Promptly issue notice pursuant to 29 U.S.C § 216(b) to all similarly situated members of the Collective Action Class, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely Equal Protection Act claims in this action by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and

b. Toll the statute of limitations on the claims of all members of the Collective Action Class from the date the original complaint was filed until the members of the Collective Action Class are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their rights to opt-in as Plaintiffs;

B. Designate Plaintiff as representative of the Collective Action Class;

C. Designate Plaintiff's chosen counsel as counsel for the Collective Action Class;

D. Declare and adjudge that Defendant's employment decisions, policies, practices, and/or procedures challenged herein are harmful and in violation of the Equal Pay Act;

E. Award back pay to Plaintiff and the members of the Collective Action Class, including a sum to compensate Plaintiff and the members of the Collective Action Class for any increased tax liability on a lump-sum award of back pay;

F. Award liquidated damages to Plaintiff and the members of the Collective Action Class in the maximum amount available under the Equal Pay Act;

G. Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Plaintiff and the members of the Collective Action Class;

H. Award Plaintiff and the members of the Collective Action Class prejudgment and post-judgment interest available under the Equal Pay Act;

I. Award Plaintiff and the members of the Collective Action Class any other appropriate equitable relief; and

J. Award any additional relief that this Court deems just and proper.

## COUNT II
### (INVIDUAL AND CLASS CLAIM)
### Violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),
### 42 U.S.C. § 2000e, *et seq.*
### GENDER-BASED WAGE DISCRIMINATION
### (Asserted by Plaintiff and the Title VII Class Against Defendant)

159.    Plaintiff re-alleges and incorporates by reference each and every allegation in the previous paragraphs as though fully set forth herein.

160.    This Count is brought on behalf of Plaintiff and all members of the Title VII Class against Defendant.

161.    Defendant is an employer of Plaintiff and the members of the Title VII Class within the meaning of Title VII.

162.    Defendant has discriminated against Plaintiff and the members of the Title VII Class by paying them less than similarly situated male employees who performed jobs which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

163.    Defendant discriminated against Plaintiff and the members of the Class by subjecting them to common discriminatory pay and performance management policies, including discriminatory salaries and hourly wages in violation of Title VII.

164.    The differential in pay between Plaintiff and the members of the Title VII Class and similarly-situated male employees was not due to seniority, merit, quantity or quality of production, or a factor other than sex/gender, but was, in fact, due exclusively to sex/gender.

165.    Defendant caused, attempted to cause, contributed to, and caused the continuation of wage rate discrimination based on sex/gender in violation of Title VII.

166.    Defendant intentionally paid Plaintiff and the members of the Title VII Class less than similarly situated male employees in violation of Title VII. The foregoing conduct constitutes a willful violation of Title VII.

167.    As a result of Defendant's unlawful conduct, Plaintiff and the members of the Title VII Class suffered and will continue to suffer harm, including, but not limited to, lost earning, lost

benefits, lost future employment opportunities, and other financial losses, as well non-economic damages.

168.    Plaintiff and the members of the Title VII Class are entitled to all legal and equitable remedies available for violations of Title VII, including, but not limited to, back pay, front pay, liquidated damages, pre-judgment and post-judgment interest, reasonable attorneys' fees and litigations costs, and other compensation.

## PRAYER FOR RELIEF ON COUNT II

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Honorable Court enter Judgment in their favor and against Defendant, as follows:

A.    Certify Count II as a class action pursuant to Federal Rule of Civil Procedure 23;

B.    Designate Plaintiff as representative of the Title VII Class;

C.    Designate Plaintiff's counsel as counsel for the Title VII Class;

D.    Declare and adjudge that Defendant's employment decisions, policies, practices, and/or procedures challenged herein are harmful and in violation of Title VII;

E.    Award Plaintiff and the members of the Title VII Class compensatory damages;

F.    Award back pay to Plaintiff and the members of the Title VII Class, including a sum to compensate Plaintiff and the members of the Class for any increased tax liability on a lump-sum award of back pay;

G.    Award front pay to Plaintiff and the members of the Title VII Class, including a sum to compensate Plaintiff and the members of the Title VII Class for any increased tax liability on a lump-sum award of back pay;

H.    Award Plaintiff and the members of the Title VII Class punitive damages;

I.    Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to counsel for Plaintiff and the members of the Title VII Class;

J.    Award Plaintiff and the members of the Title VII Class prejudgment and post-judgment interest;

K.    Award Plaintiff and the members of the Title VII Class any other appropriate equitable relief; and

L.    Award any additional relief that this Court deems just and proper.

**COUNT III**
**(INVIDUAL AND CLASS CLAIM)**
**Violation of the Tennessee Human Rights Act ("THRA"),**
**Tenn. Code Ann. § 4-21-101, *et seq*.**
**GENDER-BASED WAGE DISCRIMINATION**
**(Asserted by Plaintiff and the THRA Class Against Defendant)**

169.    Plaintiff re-alleges and incorporates by reference each and every allegation in the previous paragraphs as though fully set forth herein.

170.    This is an action arising under the provisions of the THRA and this Court has, and should exercise, pendant jurisdiction over the same because the cause of action complained of in this Count III arises out of the same facts, events, and circumstances as Counts I and II, and therefore judicial economy and fairness to the parties dictates that this Count III be brought in the same Complaint.

171.    As previously stated in Count I and II, Defendant discriminated against Plaintiff and the members of the THRA Class by subjecting them to common discriminatory pay and performance management policies, including discriminatory salaries and hourly wages in violation of the THRA.

**PRAYER FOR RELIEF ON COUNT III**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Honorable Court enter Judgment in their favor and against Defendant as follows:

A.    Certify Count III as a class action pursuant to Federal Rule of Civil Procedure 23;

B.    Designate Plaintiff as representative of the THRA Class;

C.     Designate Plaintiff's counsel as counsel for the THRA Class;

D.     Declare and adjudge that Defendant's employment decisions, policies, practices, and/or procedures challenged herein are harmful and in violation of the THRA;

E.     Award Plaintiff and the members of the THRA Class compensatory damages;

F.     Award back pay to Plaintiff and the members of the THRA Class, including a sum to compensate Plaintiff and the members of the THRA Class for any increased tax liability on a lumpsum award of back pay;

G.     Award front pay to Plaintiff and the members of the THRA Class, including a sum to compensate Plaintiff and the members of the THRA Class for any increased tax liability on a lump-sum award of back pay;

H.     Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to counsel for Plaintiff and the members of the THRA Class;

I.     Award Plaintiff and the members of the THRA Class prejudgment and post-judgment interest;

J.     Award Plaintiff and the members of the THRA Class any other appropriate equitable relief; and

K.     Award any additional relief that this Court deems just and proper.

## COUNT IV
### (INVIDUAL WRONGFUL TERMINATION CLAIM)
### WRONGFUL TERMINATION DUE TO DISCRIMINATION AND RETALIATION IN VIOLATION OF FEDERAL AND TENNESSEE LAW, TO-WIT:
### Equal Pay Act, 29 U.S.C. 206, *et seq*. ("Equal Pay Act")
### Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. ("Title VII")
### Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA")
### Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq*. ("THRA")
### Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq*. ("TDA")
### (Asserted by Plaintiff Against Defendant)

172.     Plaintiff re-alleges and incorporates by reference each and every allegation in the previous paragraphs as though fully set forth herein.

173.     Consistent with the discriminatory pattern alleged herein, male employees are also consistently treated more favorably than the female employees, and male employees were not

disciplined and/or terminated for engaging in the same, or worse, conduct that resulted in the discipline or termination of female employees and, as a result, Defendant managers, including Plaintiff, were expected to give preferential treatment to male employees that reported to them. When Plaintiff refused to treat a male employee more favorably than the female employees, she was retaliated against, disciplined, and eventually fired.

174.    Prior to Plaintiff's termination, she further questioned and complained that she was underpaid, as compared to males, for preforming the same job.

175.    In January 2018, after Plaintiff was moved to the new restaurant location, Stefano's Turkey Creek, she was told by owner and CEO, Randy Burleson, that it would be "more difficult" for her to get the restaurant started, up and running, and that she was expected to do the marketing for the restaurant, and act as the bar manager, server manager, and host manager of the restaurant, complete all paperwork and filing, inventory, and payroll.

176.    As of August 2018, male employee, Josh Morrison, was a Shift Leader at Stefano's Turkey Creek.

177.    Prior to August 2018, Josh Morrison had multiple performance and disciplinary issues during the time that he reported to Plaintiff at Stefano's Turkey Creek.

178.    As a result, Plaintiff eventually demoted Josh Morrison on or about August 2, 2018.

179.    As General Manager, the Plaintiff had the authority to discipline Josh Morrison.

180.    As General Manager, the Plaintiff had the authority to demote Josh Morrison.

181.    As General Manager, the Plaintiff had the authority to terminate Josh Morrison.

182.    At the time of Josh Morrison's demotion, the Plaintiff told him that he was being demoted due to his failure to correct his conduct and due to disciplinary issues.

183. The demotion of Josh Morrison was justified and appropriate, given his prior performance, disciplinary issues, and conduct.

184. As General Manager, the Plaintiff did not need permission or authority from her supervisors to demote one of her employees.

185. Josh Morrison thereafter reported his demotion to the owner and CEO, Randy Burleson.

186. Shortly after his demotion, Josh Morrison communicated with the owner and CEO, Randy Burleson, to complain about Plaintiff and his demotion.

187. Defendant's owner and upper management, including Randy Burleson, should support its General Managers, including Plaintiff, in their decisions to discipline their employees as needed and as appropriate.

188. In response to Josh Morrison's complaint, the owner and CEO, Randy Burleson, instructed Plaintiff to overturn Morrison's demotion.

189. However, the Plaintiff initially refused to overturn the demotion of Josh Morrison, and she complained to the owner and CEO, Randy Burleson, that she had disciplined this male employee, Josh Morrison, just like any other employee and was not going to give him preferential treatment because he was a male and preferential treatment of males was discriminatory.

190. In response to Plaintiff's refusal to give preferential treatment to this male employee, Morrison, the owner and CEO, Randy Burleson, became upset and angry with Plaintiff, and he began to retaliate against her by ceasing his communications with her, he no longer provided his support to Plaintiff or her store, he would not respond to Plaintiff's requests for assistance, and Plaintiff was otherwise treated in a cold and distant manner, isolated, and ostracized.

191.     As a result of the retaliation, in late-November or early-December 2018, the Plaintiff overturned Josh Morrison's demotion, but the owner and CEO, Randy Burleson, stopped communicating with Plaintiff by that time.

192.     As a result of the owner and CEO, Randy Burleson's retaliation, and refusal to communicate with Plaintiff, in or around January of 2019, the Plaintiff began reporting directly to COO, Mark Liggett.

193.     In January 2019, the Plaintiff complained to the COO, Mark Liggett, that the owner and CEO, Randy Burleson, was siding with the male employee that Plaintiff was expected to provide favorable treatment, Josh Morrison, without ever talking with Plaintiff, and since Plaintiff was supposed to be considered the supervisor of Morrison, and Plaintiff also complained that Morrison acted like he was "above" the female employees and Plaintiff continued to have issues with him, but when she reached out to Burleson for help he began to pull away from Plaintiff and side with Morrison.

194.     In response to Plaintiff's complaints, the COO, Liggett, agreed that Morrison "struggled with taking direction" from female managers and that this was a pattern of Morrison's behavior with his prior female General Manager where he worked previously, but nothing was ever done to address Plaintiff's complaints or concerns about Morrison.

195.     Additionally, before Plaintiff was hired by Defendant, she was diagnosed with an anxiety disorder, and she also had tremors that periodically caused her hands to shake uncontrollably due to an injury sustained at birth and the tremors were exacerbated by the anxiety.

196.     Plaintiff's anxiety disorder, tremors, and uncontrollable shaking of the hands are disabilities within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

197.     Prior to Plaintiff's termination, Randy Burleson was aware of and/or had

knowledge that Plaintiff was diagnosed with an anxiety disorder.

198.    Prior to Plaintiff's termination, Randy Burleson was aware and/or had knowledge of Plaintiff's hand tremors.

199.    Prior to Plaintiff's termination, Randy Burleson was aware of and/or had knowledge that Plaintiff's hands would shake uncontrollably from time-to-time.

200.    Prior to Plaintiff's termination, Mark Liggett was aware of and/or had knowledge that Plaintiff was diagnosed with an anxiety disorder.

201.    Prior to Plaintiff's termination, Mark Liggett was aware and/or had knowledge of Plaintiff's hand tremors.

202.    Prior to Plaintiff's termination, Mark Liggett was aware of and/or had knowledge that Plaintiff's hands would shake uncontrollably from time-to-time.

203.    After Plaintiff was promoted to General Manager in 2018 up until the time of her termination, Randy Burleson and Mark Liggett made hurtful and derogatory remarks about Plaintiff's hand tremors, such as by claiming Plaintiff's hands were shaking due to her being "hungover" from drinking alcohol when this was not true or accurate.

204.    As a result, on numerous occasions before her termination, Plaintiff objected to these remarks and complained that it was discriminatory due to her disabilities, and she complained to Randy Burleson that the remarks were not appropriate or appreciated. Thereafter, Plaintiff was retaliated against for making these complaints of disability discrimination, and she was treated in a harsh, distant and cold manner.

205.    Prior to Plaintiff's termination, Randy Burleson was aware of and/or had knowledge that Plaintiff complained of disability discrimination.

206.    Prior to Plaintiff's termination, Mark Liggett was aware of and/or had knowledge

that Plaintiff complained of disability discrimination.

207.    On March 12, 2019, the Plaintiff was abruptly terminated for a trumped-up reason.

208.    During the termination meeting, on March 12, 2019, the COO, Mark Liggett, informed Plaintiff that she was being fired because of "drama", and that "Randy [Burleson] has lost faith in your ability to be a manager" and he "put you in a position that you were not ready for", to which Plaintiff complained that she was not given the support that she needed to run the restaurant and that Burleson would only communicate with her subordinate male Shift Leader, Josh Morrison, but not Plaintiff, to which Liggett agreed.

209.    Defendant never investigated or questioned Plaintiff about any of her alleged conduct at any time prior to her termination.

210.    Defendant never investigated or questioned Plaintiff about her complaints of discrimination and the preferential treatment of male employees, including that Josh Morrison acted like he was "above" the female employees.

211.    The decision to fire Plaintiff based was solely on information provided by male employee, Josh Morrison.

212.    After Plaintiff was informed of her termination, the following day on March 13, 2019, she received a Notice of Separation, signed and dated March 12, 2020[sic], which stated a number of different alleged reasons for her termination, including, but not limited to, "THREATENING, BULLYING & HAZING BEHAVIOR, THAT DEMEANS, INSULTS, BELITTLES, INTIMIDATES & HUMILIATES FELLOW EMPLOYEES AND SUBORDINATES…." (Plaintiff's Notice of Separation, attached hereto as Exhibit 3).

213.    The alleged reasons for Plaintiff's termination, as identified in the Notice of Separation (Exh. 3), were never mentioned or discussed with Plaintiff during the termination

meeting on March 12, 2019.

214.    In addition to Plaintiff, Defendant has engaged in a pattern of discrimination by disciplining and terminating the female managers for engaging in the same, or far less serious, conduct than the male managers, such as disciplining and/or terminating the assertive female managers, and accusing them of "bulling and hazing", whereas the male managers who engaged in this exact same conduct are not disciplined or terminated, but rewarded as "leaders".

215.    For example, the Defendant has disciplined and/or terminated other female managers for alleged "bullying & hazing behavior", including but not limited to, Plaintiff, Katie Jenkins, and Kristen Heath.

216.    Thereafter, after Defendant received notice of Plaintiff's claims, Defendant again began to search for new and additional alleged reasons to "justify" Plaintiff's termination after-the-fact, including that Plaintiff was allegedly terminated due to an incident on March 3, 2019.

217.    Prior to Plaintiff's termination, the owner and CEO, Randy Burleson, never questioned or interviewed Plaintiff about her alleged conduct on March 3, 2019.

218.    Prior to Plaintiff's termination, the COO, Mark Liggett, never questioned or interviewed Plaintiff about her alleged conduct on March 3, 2019.

219.    Prior to Plaintiff's termination, the Defendant never allowed Plaintiff to respond to the allegations against her or to tell her side of the story regarding her alleged conduct on March 3, 2019.

220.    Prior to Plaintiff's termination, the Defendant did not interview or question any witnesses present on March 3, 2019, other than employee, Josh Morrison, regarding the Plaintiff's asserted conduct that was allegedly the basis for her termination.

221.    Furthermore, at all times material hereto, the restaurant where Plaintiff worked on

March 3, 2019 had a video surveillance system in place that recorded any alleged incident from March 3, 2019.

222.    Prior to Plaintiff's termination on March 12, 2019, Randy Burleson and Mark Liggett did not watch or review any video surveillance footage evidencing and/or showing any alleged March 3, 2019 incident that was the basis for Plaintiff's termination.

223.    Defendant does not have any video surveillance footage evidencing and/or showing Plaintiff's alleged conduct on March 3, 2019 that was the alleged basis for her termination.

224.    Defendant failed to preserve the video surveillance footage evidencing and/or showing Plaintiff's alleged conduct on March 3, 2019 that was the alleged basis for her termination.

225.    Had the Defendant reviewed and/or preserved the restaurant's video surveillance footage showing the alleged March 3, 2019 incident that Defendant claims was the basis for Plaintiff's termination, then Defendant would have seen male employee, Josh Morrison, engage in the very conduct that Defendant asserts was the basis for Plaintiff's termination, and that Plaintiff engaged in no such wrongdoing.

226.    The owner and CEO, Randy Burleson, made the decision and/or was involved in the decision-making process to fire Plaintiff.

227.    In a further attempt to justify Plaintiff's termination, Defendant also asserted after Plaintiff's termination that she allegedly "engaged in discriminatory and harassing behavior toward a subordinate employee based on the employee's race, national origin, or ethnicity in a manner that violated Aubrey's anti-discrimination policies and which is sufficient grounds for termination of her employment".

228.    The "subordinate employee" that is referenced above is Kenny Mubarak.

229. The Defendant's assertion that Plaintiff engaged in "discriminatory and harassing behavior" towards Kenny Mubarak is based on information provided by male employee, Josh Morrison.

230. The Plaintiff was never questioned or interviewed about her alleged "discriminatory and harassing behavior" towards Kenny Mubarak.

231. The Defendant did not interview or question any other witnesses, other than Josh Morrison, with respect to Plaintiff's alleged "discriminatory and harassing behavior" towards Kenny Mubarak.

232. Throughout Plaintiff's employment, multiple male employees engaged in the same or much worse conduct than the Plaintiff was accused of, but the males were not disciplined or terminated by the Defendant.

233. For example, multiple male employees made "jokes" about Kenny Mubarak's race, national origin, and ethnicity, such as by calling and/or referring to Mr. Mubarak as "camel", including but not limited to, the owner and CEO, Randy Burleson.

234. Calling another employee, like Kenny Mubarak, "camel" due to his race, national origin, and/or ethnicity would be considered an "discriminatory and harassing behavior toward a subordinate employee based on the employee's race, national origin, or ethnicity" that would be considered a violation of Defendant's alleged "anti-discrimination policies and which is sufficient grounds for termination".

235. The male employees, including the owner and CEO, Randy Burleson, were never disciplined or terminated for the "jokes" they made about Kenny Mubarak's race, national origin, and/or ethnicity.

236. Further, the owner and CEO, Randy Burleson, was aware and/or had knowledge

that other male General Managers, including Jody Slimp and Mickey Korzybski, allow the employees at their restaurants to stay after closing hours, when the restaurants are supposed to be closed, to hang out and consume alcohol into the early morning hours, but Slimp and Korzybski have never been disciplined or terminated for this conduct.

237.    Even for the male managers that engage in egregious conduct justifying their termination, Defendant still provided them with significant severance packages, but no such severance was provided to female managers, like Plaintiff, for example, male employees, John Burns, Tony Hewlett, and Paul Hahn were each offered severance of at least three (3) months of salary, despite engaging in certain conduct that would justify immediate termination.

238.    The owner and CEO, Randy Burleson, made the decision and/or was involved in the decision to offer John Burns, Tony Hewlett, and Paul Hahn severance at the time of their respective termination.

239.    After Plaintiff was fired, she was replaced by a male employee.

240.    After Plaintiff was fired, she was replaced by Kenny Mubarak.

241.    On information and belief, the pay of Plaintiff's replacement, Kenny Mubarak, was substantially more than what Plaintiff was paid as General Manager.

242.    Prior to Plaintiff's termination, the owner and CEO, Randy Burleson, was aware of and/or had knowledge that Plaintiff had complained of sex discrimination.

243.    Prior to Plaintiff's termination, the owner and CEO, Randy Burleson, was aware of and/or had knowledge that Plaintiff had complained of sex-based pay discrimination.

244.    Prior to Plaintiff's termination, the COO, Mark Liggett, was aware of and/or had knowledge that Plaintiff had complained of sex discrimination.

245.    Prior to Plaintiff's termination, the COO, Mark Liggett, was aware of and/or had

knowledge that Plaintiff had complained of sex-based pay discrimination.

246.     The real reasons for Plaintiff's termination and for Plaintiff not receiving equal pay for equal work in the positions of Assistant Manager and General Manager (as alleged above), as compared to the male employees, was due to her sex, and/or her disability, and/or because she was regarded as disabled, and/or due to Plaintiff's complaints of sex and/or sex-based wage discrimination and/or disability discrimination in violation of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq.*, and further, as independent, alternative, and supplemental causes of action, the Plaintiff avers that Defendant violated the provisions of the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, *et seq.*, and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq.*

247.     Defendant is responsible and liable for the discriminatory and retaliatory actions of its agents and employees under the doctrine of respondent superior and under agency principles.

248.     As a direct and proximate result of Defendant's conduct as alleged herein, the Plaintiff has suffered and will continue to suffer and sustain great and irreparable loss of tangible job benefits, including a loss of income and benefits, both past and future, including front pay, and she sustained other pecuniary losses, as well as irreparable injury, emotional distress, humiliation and embarrassment, damage to reputation and character.

249.     The conduct of Defendant is intentional, knowing, and willful within the meaning of the Equal Pay Act of 1963, 29 U.S.C. § 206, *et seq.*

250.     The conduct of Defendant is sufficient to justify an award of liquidated damages.

251.     The conduct of Defendant was intentional, malicious, with malice or in reckless disregard to Plaintiff's protected rights sufficient to justify an award of punitive damages under

Tennessee law.

252. The conduct of Defendant was a knowing violation and/or in reckless disregard of Plaintiff's federally protected rights sufficient to justify the imposition of punitive damages.

253. Following her termination, Plaintiff's attorneys served a Notice of Non-Spoliation on the Defendant, dated June 20, 2019. (Notice of Non-Spoliation is attached hereto as Exhibit 4).

254. The Defendant received the Notice of Non-Spoliation, dated June 20, 2019, that was sent on behalf of the Plaintiff (Exh. 4).

255. The Defendant has preserved all evidence requested in the Notice of Non-Spoliation (Exh. 4) including, but not limited to, the text messages by and/or between and/or in the possession of Randy Burleson and Josh Morrison.

## **PRAYER FOR RELIEF ON COUNT IV**

WHEREFORE, Plaintiff, on behalf of herself individually, respectfully requests that this Honorable Court enter Judgment in her favor and against Defendant, as follows:

A. Declare and adjudge that Defendant's, employment decisions, policies, practices, and/or procedures challenged herein constitute discrimination and retaliation in violation of the Equal Pay Act, Title VII, ADA, THRA, and TDA;

B. Award Plaintiff compensatory damages;

C. Award back pay to Plaintiff, including a sum to compensate Plaintiff for any increased tax liability on a lump-sum award of back pay;

D. Award front pay to Plaintiff, including a sum to compensate Plaintiff for any increased tax liability on a lump-sum award of back pay (or, in the alternative, reinstatement if the Court deems it appropriate);

E. Award Plaintiff punitive damages;

F. Award Plaintiff liquidated damages;

G. Award to Plaintiff's counsel reasonable attorneys' fees and litigation expenses;

H. Award Plaintiff pre-judgment and post-judgment interest;

I.     Award Plaintiff any other appropriate equitable and/or injunctive relief, including prohibiting the Defendant from engaging in discrimination and retaliation.

J.     Award any additional relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 26th day of February, 2020.

**THE BURKHALTER LAW FIRM, P.C.**

s/Zachary J. Burkhalter
David A. Burkhalter, II, BPR #004771
D. Alexander Burkhalter, III, BPR #033642
Zachary J. Burkhalter, BPR #035956
Attorneys for Plaintiff
111 S. Central Street
P.O. Box 2777
Knoxville, Tennessee 37901-2777
(865) 524-4974